IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Thomas Conners, Jr.,

       Plaintiff,

                            Case No. 1:04-cv-673

       v.

                            JUDGE GRAHAM

SpectraSite Communications, Inc.,

       Defendant.

### Opinion and Order

    This matter comes before the Court on Defendant, SpectraSite Communications, Inc.'s ("SpectraSite"), Motion for Summary Judgment on Plaintiff Thomas Conners Jr.'s ("Conners") claims (Doc. 44).

    Conners, who has Hepatitis C and was terminated by SpectraSite on July 1, 2004, alleges that SpectraSite: 1) interfered with his use of Family Medical Leave Act ("FMLA") protected leave in violation of 29 U.S.C. § 2615(a)(1); 2) terminated his employment in retaliation for exercising his right to request FMLA leave in violation of 29 U.S.C. § 2615(a)(2); 3) terminated his employment to avoid the vesting of his employee benefits in violation of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.; 4) violated the State of Ohio's public policy against discriminating against an employee on the basis of the denial of employee benefits; 5) wrongfully terminated his employment in violation of Oh. Rev. Code. §§ 4112.02 and 4112.99 due to his disability or perceived disability; 6) violated Ohio public policy under Oh. Rev. Code § 4112.02 by treating him differently than non-disabled employees, refusing to grant him a

reasonable accommodation for his disability, and wrongfully terminating his employment; and, 7) discriminated against him in violation of the Americans with Disabilities Act ("ADA") by treating him differently than non-disabled employees, refusing to grant him a reasonable accommodation for his disability, and terminating his employment. (Pl.'s Second Amend. Compl. ¶¶ 26-66.)

The Court held oral argument on the Motion on Friday, October 6, 2006. For the reasons stated by the Court at the conclusion of the parties' arguments, more fully explained in this Opinion and Order, SpectraSite's Motion for Summary Judgment on Conners's ERISA interference claim is DENIED, while SpectraSite's Motion with respect to all of Conners's other claims is GRANTED.

**I.   Summary Judgment Standard**

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993); Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992)(per curium).

The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case. LaPointe, 8 F.3d at 378. The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case. Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir.

1993).

In response, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)). The Court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993)(quoting Anderson, 477 U.S. at 251-52). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989).

Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. See also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court

considering a motion for summary judgment may not weigh evidence or make credibility determinations.  <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th Cir. 1994).

**II.  <u>Background and Facts</u>**

   **A.   Conners's Employment History with SpectraSite**

SpectraSite provides tower locations for wireless communications carriers such as Verizon Wireless and T-Mobile. Wireless carriers sign a lease and pay SpectraSite to put their receivers on SpectraSite's towers.  SpectraSite is incorporated in Delaware and headquartered in Cary, North Carolina, where the majority of its employees work.

In July of 2000, SpectraSite purchased another wireless company, Lodestar, for whom Conners was working as a sales manager. Conners interviewed for a SpectraSite position with Todd Boyer ("Boyer"), a regional sales manager.

Only a few Lodestar employees were hired to work at SpectraSite.  SpectraSite hired Conners on July 18, 2000, as a sales manager in the Northern Region, working under Boyer.  The Northern Region covered parts of the Midwest, including Ohio, and the Northeast.  Conners executed leases between SpectraSite and its clients.  At that time, Boyer worked out of Cary and Conners worked out of his home in Cincinnati, Ohio.

After a few months, Boyer and Boyer's supervisor, David Hargrove ("Hargrove") promoted Conners to the position of regional sales manager.  Conners replaced Boyer as the regional sales manager of the Northern Region, while Boyer became a regional sales manager in Irvine, California.  Boyer was then promoted to National Sales Manager, once again working in Cary.  Approximately six

4

months following Boyer's promotion, SpectraSite returned Boyer to a regional sales manager position over the newly-formed Northeast Region.  Despite the change, Boyer continued working out of Cary.

As a regional sales manager, Conners still worked from his home in Cincinnati.  He had five Midwest and Northeast sales managers reporting to him regarding their progress on executing leases with SpectraSite's clients.  Over the course of his time as a regional sales manager, Conners reported to Hargrove, Scott Griffin, Scott Lloyd ("Lloyd"), and Boyer, for the short period of time that Boyer was SpectraSite's National Sales Manager, all located in Cary.  Conners was a regional sales manager until 2002.

In the summer of 2002, SpectraSite, through Lloyd, Conners's supervisor at that time, offered Conners an account executive position.  Although it came with a pay decrease, Conners accepted the position.  He was responsible for a smaller number of towers in the Cincinnati, Ohio; Indianapolis, Indiana; and Louisville and Lexington, Kentucky territories.  His responsibilities as an account executive were analogous to those he had previously as a sales manager.  And, he no longer had sales managers reporting to him.

After Conners took an account executive position, Lloyd left SpectraSite, and Conners began reporting to Boyer in Boyer's new "Director of Sales" position, which was essentially the same as his regional sales manager position.  While neither party seems to know the exact date, by January of 2003, it is clear that Conners was reporting to Boyer. Boyer was the only one of the four previous regional sales managers, including Conners, retained in the newly-created director of sales positions.

During Boyer's tenure as Conners's supervisor in 2003, Boyer moved to Columbus, Ohio, and began working out of an office in Columbus. (Deposition of Todd A. Boyer ("Boyer Dep."), Aug. 31, 2005, 35; Deposition of Thomas Conners, Jr. ("Conners Dep.") Aug. 25, 2005, 49.) According to SpectraSite's records, as of September 2003, Conners was assigned to the Columbus office. (Def.'s Mot. for Summ. J., Affidavit of Anne Monte ("Monte Aff.") ¶ 5.)

As an account executive, Conners requested time off through Boyer, talked with Boyer individually on a daily basis regarding client accounts and leases, and participated in sales-related conference calls with Boyer. Boyer gave Conners his final performance review on or around June 3, 2004. (Conners Dep., Exhibit 13.) Conners listed Boyer as his "manager," and Boyer's location as Columbus, Ohio, on his SpectraSite Family Medical Leave of Absence Request, allegedly submitted to Boyer in early June 2004. (Id. at Ex. 16.) Boyer and Christine Parks, SpectraSite's Human Resources Director, terminated Conners's employment on July 1, 2004.

Conners testified in his deposition that "[a]ll of [his] connection was with Cary, North Carolina . . . . All of my business was handled out of Cary." (Id. at 49.) When asked why he thought this, he testified that his "counterpart," or "inside sales manager," was located in Cary. (Id. at 50.) Conners classified himself as an outside sales manager who would work with his counterpart in inside sales to negotiate deals for SpectraSite. For example, one of the inside sales managers Conners worked with was Rebecca Piver ("Piver"), who reported to Scott Lewis, a peer of Boyer's. The inside sales manager did "what [Conners] did," inside

6

the company to process clients' leases.  (<u>Id</u>. at 52.)

When Conners and his counterpart would negotiate leases for SpectraSite, they dealt with ground requirements, engineering requirements, landlord requirements, governmental requirements, customer requirements, and SpectraSite requirements that needed to be examined and fulfilled prior to the actual leasing of space on the towers.  As an example, Conners testified that the inside sales person would work with SpectraSite's engineering department to sort out any complications, while Conners would work with the client and their engineering department to ensure that the requirements for leasing space on the tower were met.  (<u>Id</u>. at 63.)  Conners summarized, "[e]very piece of paper, everything that happens, generates from Cary . . . . So all of our departments, engineering, land, real estate, everything, is in Cary.  I cannot as an employee, no one could do anything without Cary."  (<u>Id</u>. at 66.)

Finally, Conners testified that in June of 2004, he reported to Boyer.  (<u>Id</u>. at 69-70.)  He did not give any physical reports to Boyer, and any reports that needed to be delivered would be posted on SpectraSite's intranet.  Although Conners testified there were no "leads" to be had in this business as the majority of his business was transacted with the major wireless carriers commonly known to the general public, Conners testified that he was "sure" that Boyer would make suggestions to him as far as which companies to call on.  (<u>Id</u>. at 71.)

### B. Conners's Illness

Conners was diagnosed with Hepatitis C in July 1998.  Since his diagnosis, Conners feels his symptoms, including fatigue and depression, have consistently increased.  His understanding is that

his chronic Hepatitis C is constantly progressing and can only be slowed by medication.  Conners stated during his deposition: "I'm chronically ill, so I'm always sick.  I take my leave of absence when I'm on chemotherapy and I can't handle the side effects . . . .  At times I might be sicker, so I took leave when I went on medication[.]" (Conners Dep. at 167.)

Conners began receiving treatment for his Hepatitis C, consisting of a combination of the drugs Interferon and Rebetron, after his diagnosis in 1998.  Conners worked several weeks to a month after beginning this treatment, but then took a leave of absence from Lodestar.  He was out on leave for several months, but after he completed his course of therapy with the Interferon and Rebetron, he returned to work at Lodestar.  He was told he was a "non-responder" to this course of treatment in May of 1999.

Conners testified that part of "them [SpectraSite] bringing me on, was to discuss exactly how I was" with respect to his Hepatitis C, which he characterized as cancer or blood cancer.  (Conners Dep. at 123, 125.)  Conners allegedly told Boyer, "I'm OK to do this job" before being hired at SpectraSite.  (Id. at 124.)[1]

Conners began a second trial of experimental Interferon therapy while working for SpectraSite in late 2002, after which he was again informed he was a non-responder.  The therapy made all of his symptoms, namely, fatigue, nausea, body aches, and vomiting, feel worse.  Conners worked for a while after starting this therapy, but in January or February of 2003, applied for and was granted a medical leave of absence.  He worked with Boyer and

---

[1]

Boyer testified that the first time he found out about Conners's illness was before he went on his leave of absence in early 2003.  (Boyer Dep. 38.) Nevertheless, Boyer knew at some point that Conners was ill.

SpectraSite's human resources department to procure his leave.

Conners was out for seven to eight months, and returned to work in the late summer or early fall of 2003. Although SpectraSite did not pay Conners's salary during this period of medical leave, it did pay its portion of his group health insurance premiums. He also received disability insurance benefits. Boyer ensured that Conners's territory was covered. Conners was reinstated to his position as account executive with no change in his salary.

### C. Conners's Alleged Request for Medical Leave in June, 2004

Conners alleges he filled out an application for FMLA medical leave and disability benefits on June 7, 2004, and submitted this form to Boyer on June 8, 2004. He requested that his leave begin in thirty days, or around July 8, 2004.

Conners testified at his deposition that he attempted to give Boyer the FMLA paperwork while driving with Boyer and fellow account executive Kristopher Nickel ("Nickel"), to a sales meeting with Verizon Wireless on or around June 8, 2004. Boyer allegedly told Conners to hold onto the paperwork. Conners then gave the paperwork to Boyer that evening at the Columbus office. Conners alleges that Boyer told him that he did not "look sick," and that it was "bad timing," because Conners's territory was going to "carry our region." (Conners Dep. 185-186.) Conners stated that Boyer asked him to make sure his work was "cleaned up" to be handed off, though he was never told who to give his work to. (Id. at 187.)

9

Conners also allegedly spoke with Kristi Murphy[2] of SpectraSite's Human Resources Department regarding his FMLA leave, and told her that he gave his FMLA form to Boyer. Murphy allegedly told Conners she would send him paperwork regarding the company's disability insurance. (Id. at 189).

Boyer testified that Conners did not give him any FMLA paperwork or ask to take any medical leave prior to his termination, but instead submitted it after his termination to Human Resources. (Boyer Dep. 49.) Boyer did, however, find Conners's FMLA form in Conners's employee file in his office after Conners's termination.

The form is entitled "SpectraSite Family Medical Leave of Absence Request," to be completed in conjunction with the "Leave of Absence Request Form." (Conners Dep. Ex. 16.) On the form, Conners lists Boyer as his manager. He states the reason for his FMLA request is the "inability of the employee to perform the functions of the employee's position due to a serious health condition." (Id.) The form states he requests an FMLA leave of absence to begin on July 6, 2004, and run through "unknown." (Id.) Conners signed and dated the first page of the form June 7, 2004. (Id.) This form states that Conners was required to have a Medical Certification Form completed and returned to the benefits department within human resources within fifteen days of the initial FMLA request. Conners testified he did not know what that form was or when it could have been submitted, but thought that his

---

[2] Conners also refers to Kristi Murphy as Kristi Melton Murphy. Other SpectraSite witnesses also refer to "Christy Melton" of the SpectraSite human resources/benefits department. It appears to the Court that this is the same person.

physician filled out a "health care provider form." (Conners Dep. 223.)

The attached Leave of Absence Request Form, states that Conners is requesting approval of Leave of Absence for short-term disability. This form also lists his "expected return date" as "unknown." (Conners Dep. Ex. 16.) The form lists Conners's requests to continue the following Employee Health and Welfare Benefits during approved paid leave: Blue Cross Blue Shield PPO Program, Supplemental Life Insurance, and Supplemental Income Protection. Conners signed and dated this page July 6, 2004. Conners testified that the July 6, 2004 date was erroneous, and was supposed to have read June 7, 2004. (Conners Dep. 222.)

Neither Boyer, as Conners's supervisor, nor anyone from SpectraSite's human resources department signed these forms in the designated areas to signify SpectraSite's approval.

**D. Conners's Performance History with SpectraSite**

Boyer testified that he liked Conners, thought he was a hard worker, and told Lloyd that he would like to offer Conners a position as an account executive. (Boyer Dep. 17.) When Conners previously worked for Boyer, Boyer stated that his performance was very good, customers liked him, and he had a good work ethic. (Id.) Boyer did describe Conners as "confrontational." (Id. at 38.)

One of Conners's subordinates (and later Conners's peer as an account executive), Nickel, testified in his deposition that as a boss, Conners was "great." (Deposition of Kristopher Nickel ("Nickel Dep."), Aug. 26, 2005, 18.)

**1. Corrective Counseling & Disciplinary Action**

11

In July of 2002, Conners's then supervisor, Lloyd, gave Conners a SpectraSite form entitled, "Employee Corrective Counseling & Disciplinary Action" (the "final written warning"). (Conners Dep. Ex. 11.)  The report details alleged complaints by one of Conners's subordinates, Lisa Cooper ("Cooper"), for: 1) failing to promptly return her phone calls resulting in her lack of preparedness for a client meeting; 2) failing to return one phone call where Cooper asked him a question; 3) making unprofessional comments about his subordinates "comp plans" versus his own during a weekly sales conference call; 4) making derogatory comments to Cooper's peer, Dave Elke ("Elke"), about his performance during a conference call and then hanging up on his staff; 5) losing his temper and raising his voice during sales calls; and 6) telling Elke he (Conners) was not offered a director of sales position because Cooper and Elke complained about his lack of professionalism and then hanging up on Elke.  (Id.)  A box at the top of the form captioned, "Final Written Counseling/Suspension," was checked.[3]  At the bottom of the page under the heading "Consequences of Failure to Improve," a box labeled "Dismissal Will Be Recommended," is checked.

A section labeled, "Concerns & Implications of Employee Actions" states:

> Repeated pattern of losing his temper and raising his voice and [sic] his direct reports on their weekly calls. Demonstrated lack of leadership by not being able to address issues/problems with staff in a manner that did not make them feel threatened, intimidated, berated, etc. Demonstrated lack of professional judgment in the public

---

[3]  The other check-boxes are labeled: 1) Verbal Counseling, 2) Written Counseling, and, 3) Termination.

> comments he made to employees that were best addressed
> privately, and similar lack of judgment in choosing to
> voilate [sic] the spirit of the open door policy and
> contact Dave Elke and accuse him of being the primary
> reason he was not hired for the Director's role.
>
> Also showed pattern on [sic] not returning phone calls in
> a timely manner and deleting employee emails prior to
> reading and responding to the sender - Tom has been
> written up for these type of actions prior to these
> incidents - this type of behavior will not be tolerated
> going forward.

(<u>Id</u>.)

The comments in the section labeled "Expectations for Improvement," state that in Conners's new role as account executive, "[t]he expectation is for Tom to demonstrate the ability to exercise solid business judgment and controll [sic] his temper so his emotions do not impact his behavior when communicating with other SCI co-workers." (<u>Id</u>.) And further, "[t]hese expectations must be immediate and sustained as failure to demonstrate significant and continued improvement further [sic] disciplinary action up to and including immediate dismissal." (<u>Id</u>.)

In the "Employee Comments" section, Conners states that he "completely disagree[s] with the bulk of these statements/accusations." (<u>Id</u>.) He also stated in the comments section, "I will not deny that on occasions I would lose my cool, but direct management put me in a tough situation." (<u>Id</u>.) Further, "I will not deny being under extreme pressure to try and make my numbers. I can admit to sometimes being cranky but not unprofessional." (<u>Id</u>.)

In his deposition, Conners admitted that he signed this form and acknowledged receiving it and added his comments in the

13

"Employee Comments" section.  (Conners Dep. 161.)  Conners also admitted to having discussions with Hargrove and someone from SpectraSite's human resources office regarding Cooper's complaints about him.  (Id. at 154-55.)  He acknowledged that there was a "great possibility" that one of Cooper's emails to him could have been deleted without him having read it first.  (Id. at 156.)  He also said that he probably started some conference calls late.  (Id. at 157.)

### 2. Conners's 2004 "Employee Performance Review"

Boyer completed Conners's final performance review with SpectraSite in early June of 2004.  (Conners Dep. Ex. 13.)  The "review date" listed on the form is June 2, 2004.  (Id.)  Overall, the review was positive and listed Conners's "overall performance rating" as a "four" out of a possible "five."  One of Boyer's comments listed on the review under the heading "Teamwork: Communication" stated, "[k]eep more oral communication with me when you have mixed emotions and not channel them in non-productive emails, such as your reason to fire me email."  On Monday, January 13, 2003, Conners allegedly sent Boyer an email which read: "[d]o not worry about me, I will get everything I need to do done.  I will not give you or Danny any reason to fire me."  (Conners Dep. Ex. 12.)  Conners testified at his deposition that he had not seen this email before and did not remember the circumstances under which it was allegedly sent, but that he had no reason to believe that he did not send it to Boyer.  (Conners Dep. 167-68.)

### 3. Conners's Email to T-Mobile Representative Jose Saucedo

On Tuesday, May 25, 2004, Piver, a "Project Manager," for

14

SpectraSite in Cary, initiated email correspondence with Jose Saucedo of T-Mobile regarding amendments to certain documents apparently being negotiated between SpectraSite and T-Mobile. (Conners Dep. Ex. 14.) Piver copied Conners on this email. After a back-and-forth exchange between Piver and Saucedo regarding the execution of an agreement or amended agreement between the parties, Piver informed Saucedo he would need to discuss lease commencement terms with Conners. Additional discussion regarding obtaining a construction start date ensued between Conners and Saucedo, culminating in Conners sending Saucedo, Boyer, and Nicole Dobrowolsky ("Dobrowolsky") (Saucedo's superior at T-Mobile) an email on June 29, 2004, which stated:

> Jose, You have not agreed to one thing I have offered you (T-Mobile) in the year that I have been back to work. What I said was not a wise crack. I can not [sic] work with you, so for the time being you need to send your requests directly to my Boss Todd Boyer. At this point I am afraid I might say something I shouldn't, even though it would be well deserved. I will work with Todd Boyer on the other side so that I can be relieved of this conflict."[4]

(Id.) Conners copied Piver on the email. Conners did not discuss the email with Boyer prior to sending it. (Conners Dep. 198.) Conners asserts that Piver could not deal with Saucedo anymore and asked him to join in the exchange. Conners also claims that several people had problems with Saucedo, including Boyer, and that with respect to this conflict with T-Mobile, he was "directed to stand firm and straighten it out, like usual." (Id. at 197.)

Conners claims that Boyer initially laughed about the email.

---

[4]
The Court will refer to this email as the "Saucedo Email."

(Conners Dep. 197.)  A day or so later, according to Conners, Boyer called Conners and said "[t]his email chain didn't have to happen like this."  (Id. at 205.)  Conners claims that he worked everything out with Saucedo and Dobrowolsky, and then reported to Boyer that everything was "worked out and on track." (Id. at 206.) Conners claims that Boyer later told him that no one from T-Mobile complained about the email.  (Id. at 225.)  Boyer, however, testified that he called Saucedo personally and apologized to him for the email. (Boyer Dep. 41.)  Boyer's supervisor, Daniel Agresta ("Agresta"), also testified that he called Saucedo to apologize for Conners's email.  (Deposition of Daniel Agresta ("Agresta Dep."), Aug. 31, 2005, 30, 43.)

Boyer forwarded Conners's email to Parks, and asked her to speak with him about it. (Boyer Dep. Ex. 1.)  She testified at her deposition that Conners's email to Saucedo was one of the factors that lead to the decision to terminate Conners.  (Parks Dep. 10.)

Despite the Saucedo email, SpectraSite and T-Mobile did reach an agreement and the "deal" came out successfully.  (Boyer Dep. 67.)  Boyer negotiated and closed the deal with T-Mobile prior to Conners's termination on July 1, 2004.

### 4. Conners's Meeting with Boyer at Frisch's Restaurant

On July 1, 2004, Conners and Boyer met at a Frisch's Big Boy restaurant in Cincinnati, ostensibly to prepare for a meeting with Cincinnati Bell Wireless regarding some new business for SpectraSite.  Conners asserts the meeting was also to discuss his pending medical leave.  According to Conners, they did not discuss his transition, but instead Boyer immediately began discussing the Saucedo email and other perceived problems.  Conners believes that

16

Boyer "probably" said the Saucedo email was inappropriate.  (<u>Id</u>. at 209-210.)  Boyer told Conners that  Conners would not be attending the Cincinnati Bell meeting.  Conners believed this "probably" could have been because of the Saucedo email.  (<u>Id</u>. at 210.) Conners suspected that there was a problem, and recalled that Boyer stated that he and Parks would speak with Conners later that day.

Boyer testified that he had no intention of bringing Conners to the Cincinnati Bell meeting, because he was being "irrational," but Conners had the site maps to be delivered to Cincinnati Bell which Boyer needed for the meeting.  (Boyer Dep. 59.)  Boyer testified:

> I told tom that he would not be attending that meeting. So I wanted to get his feedback.  You know, I wanted to talk to him face-to-face, you know, regarding this e-mail that he sent to Jose because it was not like Tom to do something like this.  You know, he typically maintained his cool as a sales professional.

(Boyer Dep. 60.)  Boyer testified that Conners "raised his temper" and began yelling at him such that Boyer was afraid of Conners and thought he might physically attack him.  (<u>Id</u>. at 60-61.)

Conners testified that he asked Boyer, "what are you doing to me, Todd.  I'm very sick." (Conners Dep. 211.)  Conners stated the following in his deposition:

> Q.   All right.  Now, tell me about the meeting that you had with Todd and what transpired.
> A.   I don't know all that transpired.  I don't remember everything.  I know that we did not go into any transition.  Todd went right into the email and issues and things that he perceived were problems.
> . . .
> Q.   Is it possible that he said, you're not going [to the client meeting] because of an-email that you sent to T-Mobile?
> A.   I believe it probably was.

17

Q.   Is it true that you responded that you, quote, could not stand the T-Mobile representative?

A.   I don't know that.

Q.   Is it possible that you said that you hated T-Mobile?

A.   I don't know that.

Q.   Is it possible that you said, I will say whatever I want to say, I will call a spade a spade when I feel like it, and I'm not going to take any shit from anybody?

A.   I would highly doubt that.

Q.   Do you have any recollection of that?

A.   No.

Q.   You just don't know one way or the other, do you?

A.   I don't believe that sounds like me.

Q.   Did you tell Todd Boyer that you were not sorry for what you had done, and that you were not going to work with T-Mobile in the future?

A.   I would highly doubt that also, since I had already had everything straightened out and dealt with the every day.  And remember—let's just go for the record.  This is one of 30 T-Mobile people I dealt with every day.  And this was the guy at the bottom of the list, the number 30.  So I could not say that.

. . .

Q.   Did you raise your voice to Mr. Boyer in the meeting at the Big Boy restaurant?

A.   I don't believe so.  I went back to Frisch's and asked them, and they said that there was no display of anything that they noticed.

Q.   Who did you speak to?

A.   I have no idea, the waitresses out there who was waiting on us.

Q.   But you don't know who their names are?

A.   I do not.

(Conners Dep. 209-212.)  Boyer denied that he knew that Conners was ill during the time of the meeting because Conners "never brought that up."  (Boyer Dep. 94.)  As stated, supra, however, Conners testified in his deposition that he informed Boyer of his request to take medical leave and short-term disability in early June, prior to the meeting at Frisch's, and contended that part of the reason for the Frisch's meeting was to discuss his pending

18

transition to medical leave.  Boyer subsequently attended the
Cincinnati Bell meeting on his own.

Conners sent Boyer and Agresta an email on July 1, 2004,
apologizing and stating he "made a mistake," and "used poor
judgment," in sending the Saucedo email.  (Conners Dep. Ex. 15.)
Conners testified in his deposition that he sent this email after
Boyer would not permit him to attend the meeting with Cincinnati
Bell and he realized there was an "issue."  (Conners Dep. 220-221.)

### 5.  Conners's Termination from SpectraSite

Boyer and Parks terminated Conners over the phone during the
afternoon of July 1, 2004, after Boyer's meeting with Conners at
Frisch's.  Boyer spoke with Parks after the meeting and told her
how Conners allegedly "flew off the handle."  (Boyer Dep. 95-96.)
The decision to terminate Conners was a collective one between
Boyer, Parks, and Agresta.

Boyer testified that before the meeting at Frisch's, he was
leaning toward terminating Conners because of the Saucedo email.
(Boyer Dep. 92.)  Boyer stated that until Conners's behavior at the
meeting, nothing else aside from the Saucedo email factored into
his decision to recommend Conners's termination, nor did Parks
mention anything in Conners's record of employment that assisted
Boyer in reaching his decision.  (Id. at 92-93.)  Boyer testified
that he and Parks did not feel that after the Saucedo email, saving
Conners's job was an option, however, Boyer, "wanted to hear him
out" and "understand why he flew off the handle to a customer."
(Id. at 94.)

Boyer testified, "[s]o I wanted to meet with Tom Conners in
person and that's when he just flew off the handle.  He was being

very loud.  And basically saying he didn't care, call a spade a
spade when I want to.  That's when I was afraid that he was going
to do something crazy." (Id. at 91.)  After the meeting, Boyer
told Parks, "I don't want him on my team.  I'm too young for this
stuff.  I don't need the stress" . . . . It's like, I don't need
the stress or to deal with this.  If anyone's going to treat me
that way and treat our customer, then they should be let go, in my
opinion." (Id. at 91-92.)  And, "I told her how he-like I said,
raised his voice to me and flew off the handle.  I communicated
that to Christine." (Id. at 95-96.)

According to Parks, the outcome of the meeting between Conners
and Boyer was the last straw in the decision to terminate Conners.
(Parks Dep. 5.)  With respect to the decision to terminate Conners,
Parks testified:

> Q.    At the time you made-is it fair to say that after
>       the Frisch's meeting, Mr. Boyer made a
>       recommendation to fire Mr. Conners?
> A.    I believe that would be correct.  That this was, as
>       you put it the straw that broke the camel's back.
>       And that we were going to-you know, again, I would
>       run through my normal process of making sure that
>       Danny [Agresta] knows and making sure that Mel
>       [Asbury] knows, when I said that I went back and
>       had a meeting with Mel.  And based on that last
>       reaction . . . we needed to move forward with
>       letting him go.

(Id. at 26.)  She stated the reasons for Conners's termination were
his interaction with a client and his interaction with Boyer.  (Id.
at 42.)  Parks testified that she could not answer and did not know
what SpectraSite would have done had Conners acted differently
during his meeting with Boyer.  (Id. at 5-6.)

Parks also discussed the recommendation to terminate Conners

20

with her superior, Melton Asbury, SpectraSite's Senior Vice President of Human Resources. (Parks Dep. 27; Deposition of Melton Asbury ("Asbury Dep."), Aug. 31, 2005, 7.) Parks briefed Asbury on the situation; Asbury reviewed Conners's personnel file and concurred in the decision to terminate Conners. (Asbury Dep. 7-8.) Asbury referenced Conners's "final written warning," as a factor in the termination decision, stating, "[g]iven the facts of his situation and given the prior final warning, we carried out the termination." (Id. at 23.) Specifically, Asbury testified:

> Q. What were the matters that you recall reviewing about the prospective termination, about Mr. Conners' employment, what he did or did not do in order to bring it to your attention?
>
> A. My recollection in reviewing the file was that he had a record of being disruptive in dealing with folks. He had, on this occasion, actually fired-off at a customer in an email. And I thoroughly read the emails to see the details of it. And I also think she told me that he had fired-off on his supervisor also, in terms of being disruptive. So there was a pattern of disruptive behaviors, which is what I was looking for, to make sure that we were being prudent in our decision.
> And then the ultimate factor was what he had done with a customer, and that's just unacceptable, beyond being disruptive with your coworkers, being disruptive with a customer was unacceptable.

(Asbury Dep. 8-9.)

Conners thought that when SpectraSite terminated him, he would "go on disability or whatever the case was, and not return to SpectraSite." (Conners Dep. at 214.) Conners testified that immediately after being terminated he called "Kristi" with SpectraSite and asked where his paperwork was, to which she allegedly replied she was sending it to him. (Id. at 217.) He alleges he called her again approximately a few days later and

asked when he would receive his paperwork; she informed him that she was not sending it because he had been terminated.  (<u>Id</u>.)

Parks testified that she thought Conners left a message with Christy Melton on June 1st stating he wanted a leave of absence. (Parks Dep. 32-33.)  Parks stated that the decision to terminate Conners had already been made by this time but not yet communicated to Conners.  Parks testified that she contacted SpectraSite's counsel regarding Conners's voicemail message to Melton about his prospective leave of absence.  (<u>Id</u>. at 34-35.)  Parks spoke with Asbury after she spoke with SpectraSite's counsel and he allegedly stated that it was appropriate to "move forward with terminating his employment."  (<u>Id</u>. at 35-36.)  Asbury testified that no one told him on the day of the termination that a medical leave request came from Conners to the SpectraSite benefits department.  (Asbury Dep. 24.)

Boyer completed an Employee Status Change report regarding Conners's termination, (Def.'s Mot. for Summ. J., Ex. A.)  Under a heading requesting the supervisor to give details of the employee's termination, Boyer wrote: "[m]isconduct.  Tom sent an email that slandered the customer, which was disrespectful and lacked professionalism.  Also, Tom failed to keep his composure and showed disrespect towards me as well."  (<u>Id</u>.)

**III. <u>Conners's FMLA Claims</u>**

SpectraSite argues that Conners interference and retaliation claims under the FMLA both fail because he was not an eligible employee within the Act.  As such, he has no rights under the Act pursuant to which he can state these claims.

**A.    The FMLA Framework**

22

Congress enacted the FMLA to provide job security and help employees "balance the conflicting demands of work and personal life." <u>Price v. City of Fort Wayne</u>, 117 F.3d 1022, 1024 (7th Cir. 1997); <u>see</u> <u>also</u> 29 U.S.C. § 2601(b). It permits eligible employees to take a total of twelve weeks of leave during any twelve month period for one or more of the following reasons: (A) to welcome a new child into the family; (B) to care for a family member with a serious health condition; or (C) because of a serious health condition that prohibits the employee from performing the functions of his or her position. 29 U.S.C. § 2612. Employees who take leave for one of these reasons are entitled to the same or an equivalent position upon their return. 29 U.S.C. § 2614(a)(1).

The FMLA prohibits employers from interfering with, restraining, or denying the exercise of any rights created by the statute. <u>See</u> 29 U.S.C. § 2615(a)(1). The Act also prohibits employers from discharging or discriminating against employees who oppose unlawful FMLA practices. <u>See</u> 29 U.S.C. § 2615(a)(2). Claims brought under § 2615(a)(1) are generally referred to as interference claims, while claims brought under § 2615(a)(2) are referred to as retaliation claims.

To demonstrate a prima facie case for an interference claim, a plaintiff need only show that he was "both eligible for leave, as contemplated by 29 U.S.C. § 2611(2), and entitled to leave, as contemplated by § 2612(a)(1)(D)." <u>Swanson v. Senior Res. Connection</u>, 254 F. Supp. 2d, 945, 951 (S.D. Ohio 2003). To establish a prima facie case of FMLA retaliation, however, the plaintiff must prove each of the following elements: (1) he availed himself of a protected right under the FMLA by notifying his

23

employer of his intent to take leave; (2) he was adversely affected by an employment decision; and (3) a causal connection exists between the two actions.  Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir. 2001).

Courts in this circuit analyze FMLA retaliation claims using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Harnisch v. Aeroquip Inoac Co., No. 3:99 CV 7609, 2000 U.S. Dist. LEXIS 19317, at *8 (N.D. Ohio Oct. 12, 2000); Stonum v. U.S. Airways, Inc., 83 F. Supp. 2d 894, 899 (S.D. Ohio 1996).  Under the McDonnell Douglas test, the plaintiff has the initial burden of proving a prima facie case by a preponderance of the evidence.  See Ang v. Procter & Gamble Co., 932 F.2d 540, 548 (6th Cir. 1991).

Once a plaintiff demonstrates these elements, a presumption of retaliation is raised, and the defendant then has the opportunity to rebut this presumption by articulating some legitimate, non-discriminatory reason for its decision.  See McDonnell Douglas, 411 U.S. at 804.  The plaintiff must then produce evidence that the employer's reasons were merely a pretext for retaliation.  Pretext may be shown by demonstrating: 1) that the proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate the discharge; or 3) that the proffered reasons were insufficient to motivate discharge.  Walsh v. United Parcel Service, 201 F.3d 718, 729 (6th Cir. 2000)(quoting Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1995)).

**B.   Eligibility Under the FMLA**

The FMLA does not cover employees working at a worksite that employs fifty people or less, if there are less than fifty people

24

employed within a seventy-five mile radius of that worksite.  29 U.S.C. § 2611(2)(b)(ii).  Thus, these individuals are not "eligible employees" under the FMLA.  Id.  The Code of Federal Regulations elaborates on the definition of "worksite" for salespersons like Conners who have no fixed worksite:

> For employees with no fixed worksite . . . salespersons, etc., the 'worksite' is the site to which they are assigned as their home base, from which their work is assigned, or to which they report . . . . An employee's personal residence is not a worksite in the case of employees such as salespersons who travel a sales territory and who generally leave to work and return from work to their personal residence, or employees who work at home, as under the new concept of flexiplace. Rather, their worksite is the office to which the [sic] report and from which assignments are made.

29 C.F.R. § 825.111(a)(2).  At the time Conners allegedly requested FMLA leave in early June, 2004, he undisputedly worked from his home in Cincinnati, which cannot be considered his worksite.

Whether fifty employees are employed within seventy-five miles of a particular worksite is determined at the time the employee gives notice of his intent to take FMLA leave.  29 C.F.R. § 825.110(f).  In this case, assuming Conners's version of the facts to be true, he gave notice of his intent to take FMLA leave on or about June 8, 2004.

SpectraSite employed well over fifty individuals at its headquarters in Cary, North Carolina, during June of 2004. However, this was not true of SpectraSite's other offices, including its Columbus, Ohio, office at that time.  Although Conners does not contest the number of employees reporting to the Columbus office during June of 2004, SpectraSite has offered evidence showing that from July 2003 to July 2004, SpectraSite only

had one office in Ohio, the Columbus office, and during that time, no more than fifteen employees either worked in or reported to SpectraSite's Columbus office. (Monte Aff. ¶ 5-7). Specifically, in June 2004, twelve employees worked in or were assigned to the Columbus office. (Id. ¶ 5.)

SpectraSite claims Conners's worksite was Columbus, while Conners claims it was Cary. Thus, the questions for the Court's determination are: a) where was Conners was assigned as his home base; b) from which office was his work was assigned; or c) to which office did he report.

Anne Monte, SpectraSite's Human Resources Coordinator during Conners's tenure with the company, testified that Conners was assigned to the Columbus office from September 2003, through his termination in July, 2004. Conners has not disputed Monte's testimony. Thus, the Court will turn its attention to the next two questions: from which office was Conners's work assigned and to which office did he report at the time he requested leave.

As to the first question, courts within the Sixth Circuit have found, "[t]he assignment prong has been determined to focus on the 'day-to-day instructions received by the sales representatives, notwithstanding centralized payroll and certain other centralized managerial or personnel functions.'" Leverne v. Shelby Grop. Int'l, Inc., No. 04-2884 BP, 2005 U.S. Dist. LEXIS 29814, at **10-11 (W.D. Tenn Nov. 10, 2005) (quoting Cialini v. Nilfisk-Advance Am., Inc., No. Civ. A. 99-3954, 2000 U.S. Dist. LEXIS 2042, at *4 (E.D. Pa. Feb. 28, 2000) (citations omitted)). As to the second question, "[c]entral to the reporting element is 'the location of the personnel who were primarily responsible for reviewing sales

reports and other information sent by the sales representatives, in order to record sales, assess employee performance, develop new sales strategies, and the like.'" Id. (quoting Cialini) (citations omitted).

Conners testified that he was in daily contact with the Cary office, primarily through his inside counterpart, Piver.  Conners explained that when working together on leases, Piver would work with SpectraSite's internal departments, while Conners would work with the client and its departments, to ensure that the groundwork was laid for the client to lease space on SpectraSite's towers. Conners also filed any sales reports on SpectraSite's intranet. Conners testified that during much of his tenure at SpectraSite, the regional sales manager, or director of sales, to whom he reported was based in Cary.  However, the record shows that from the time Conners returned from his seven to eight month medical leave in the late summer or early fall of 2003, through his termination in July 2004, he reported to Boyer, who was located in Columbus.

At the time Conners requested leave, his supervisor, Boyer, worked out of SpectraSite's Columbus office.  Account executives like Conners submitted their expense reports to Boyer. (Boyer Dep. at 52.)  Boyer had quarterly regional sales meetings with the "sales team."  (Id. at 55.) Account executives set quarterly "management by objective" opportunities and goals and would submit them to Boyer, which he would review at the end of the quarter. (Id. at 48.)  Boyer reviewed Conners's performance as an Account Executive for SpectraSite.  (Id. at 18, 45-47.)  Boyer attended or was scheduled to attend some sales calls with Conners (i.e. the

Verizon Wireless meeting where Conners asserts he tried to give his
FMLA paperwork to Boyer and the Cincinnati Bell Wireless meeting,
which Boyer prohibited Conners from attending).  Boyer, with Parks,
terminated Conners.  Boyer completed the Employee Status Change
Report for Conners to be sent to Human Resources upon Conners's
termination.

While Conners may have worked <u>with</u> individuals like Piver in
Cary on a day-to-day basis, he has not offered evidence showing he
reported to anyone in the Cary office, or received his assignments
from anyone in the Cary office during his last year of employment
with SpectraSite.  Taken in a light most favorable to Conners,
there is no genuine issue of material fact regarding Conners's
worksite at the time he allegedly requested FMLA leave.

## C.   Conners's Additional Arguments

Conners presents two additional arguments regarding his status
as an eligible employee: 1) SpectraSite "admitted" that Conners was
an eligible employee because SpectraSite previously extended FMLA
leave to him and other account executives; and, 2) because only
some of SpectraSite's District Managers had offices outside of
their homes, the account executives "reporting" to those managers
and the managers themselves would actually report to Cary (as the
manager's homes cannot be considered worksites under the
regulations) and would be FMLA-eligible employees because more than
fifty employees report to headquarters.  This would allegedly
result in confusion and inconsistency within the organization.

Conners's first argument, that SpectraSite "admitted" he is
an "eligible employee" under the FMLA because they have previously
granted him, and others who allegedly reported to offices with

28

fewer than fifty employees, FMLA leave is unavailing.  The Sixth Circuit has previously held, "neither the parties nor the court has the authority to expand the scope of the Act to apply where the employer does not have the requisite number of employees." Douglas v. E.G. Baldwin & Assoc. Inc., 150 F.3d 604 (6th Cir. 1998); Coen v. Sybron Dental Specailties, 1 Fed. Appx. 386 (6th Cir. 2001.); Hummeny v. Genex Corp., 390 F.3d 901, 904-905 (6th Cir. 2004.).

The Sixth Circuit overruled part of its holding in Douglas in which the court found that a district court lacked subject matter jurisdiction to hear a putative FMLA claim where the employee was not an "eligible employee" under the statute.  Cobb v. Contract Trans., Inc., 452 F.3d 543, 549 (6th Cir. 2006) ("In Douglas, a panel of this Court incorrectly held that a district court lacks subject-matter jurisdiction over a plaintiff's FMLA claims where the defendant is not an 'employer' within the meaning of the FMLA, the plaintiff's claim does not arise under federal law within the meaning of 28 U.S.C. § 1331.  This line of reasoning, however, erroneously conflates subject-matter jurisdiction with failure to state a claim on which relief can be granted) (citing Arbaugh v. Y & H Corp., U.S., 126 S. Ct. 1235, 1242-43, 163 L. Ed. 2d 1097 (2006)).  The Sixth Circuit gave no indication in Cobb that it was overruling the portion of its holding in Douglas finding that an employer or employee could not expand the scope of the FMLA.

Additionally, as the Sixth Circuit has found with respect to the ADA, "an employer who provides an accommodation that is not required by the ADA to one employee is not consequentially obligated to provide the same accommodation to other disabled employees." Smith v. Ameritech, 129 F.3d 857, 867 (6th Cir. 1997).

In <u>Smith</u>, the court found that "if the ADA required employers to offer all disabled employees an accommodation that it provided 'to some employees as a matter of good faith,' then 'a good deed would effectively rachet up liability.'" <u>Id.</u> at 896 (quoting <u>Myers v. Hose</u>, 50 F.3d 278, 284 (4th Cir. 1995)).  This is analogous to the situation in this case.

Conners's second argument regarding the potential for inconsistent application of the employee worksite rule also fails. Conners argues that he would be unfairly penalized simply because Boyer chose to work out of an office when he lived in Columbus, whereas other account executives whose supervisors worked from their homes would be considered to report directly to the Cary office and would be eligible employees under the FMLA.  This argument is irrelevant to whether Conners was assigned to the Columbus office, received his assignments from the Columbus office, or reported to the Columbus office, as provided in the regulations. Further, this argument was rejected by the Eastern District of Pennsylvania, and the Court finds its reasoning persuasive. <u>Cialini</u>, 200 U.S. Dist. LEXIS 2042, at ** 16-17.  In <u>Cialini</u>, the plaintiff argued that because regional sales managers worked out of their homes, and their homes could not be considered "worksites" under the regulations, the only possible office to which the sales managers' subordinate employees could report was the company's main facility.  <u>Id.</u> at * 16.  In responding to that argument, the Court noted that, "[o]n its face, the regulation [29 C.F.R. § 825.111(a)(2) does not prohibit consideration of a <u>supervisor's</u> personal residence as 'the office to which [a salesperson] . . . reports,' or from which the sales person receives an assignment."

Id. (emphasis added.)

Conners has not shown a genuine issue of material fact as to the location of his worksite when he allegedly requested leave in June of 2004.  As there were not fifty employees who reported to the Columbus worksite, and were not fifty employees within a seventy-five mile radius of the Columbus worksite, Conners was not an eligible employee under the Act, and has failed to make a prima facie case for his interference and retaliation claims under the Act.  The Court thus grants SpectraSite's Motion as to both of Conners's FMLA claims.

## IV.  <u>Discriminatory Actions under the ADA and Ohio law</u>

Conners asserted claims of disability discrimination under the ADA and Ohio law, including claims for failure to accommodate his disability, disparate treatment on the basis of his disability, and wrongful termination due to his disability.

It is unlawful under the ADA to discriminate against a qualified individual in the terms and conditions of employment based on that individual's disability.  42 U.S.C. § 12112(a).  An employer violates the ADA if it fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).  A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42

31

U.S.C. § 12111(8).

　　To prevail on a failure to accommodate claim, a plaintiff must show: 1) that he has a disability; 2) that he was qualified for the job; and 3) that he was denied a reasonable accommodation for his disability.  Roush v. Weastec, Inc., 96 F.3d 840, 843 (6th Cir. 1996).  The employee must establish that a reasonable accommodation is possible, and that he is qualified for the position with such reasonable accommodation.  Hoskins v. Oakland County Sheriff's Dep't, 227 F.3d 719, 728 (6th Cir. 2000).  An employer is not required to make an accommodation if it fulfills its burden of proving that such reasonable accommodation would impose an undue hardship.  Id.; 42 U.S.C. § 12112(b)(5)(A).

　　Under the ADA, a plaintiff must show the following to establish a prima facie case of improper termination or disparate treatment: 1) that he is disabled; 2)that he is otherwise qualified for the position, with or without reasonable accommodation; 3) that he suffered an adverse employment decision; 4) that the employer knew or had reason to know of the disability; and 5) the position remained open, or the disabled individual was replaced.  Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1185 (6th Cir. 1996); Layman v. Alloway Stamping & Mach. Co., 98 Fed. Appx. 369, 375 n.2 (6th Cir. 2004) (citing Monette, 90 F.3d at 1185).

　　Ohio Revised Code 4112.02(A) states it is unlawful for an employer to discharge an individual without just cause due to a disability or "otherwise to discriminate against that person with respect to hire, tenure, terms, conditions or privileges of employment, or any matter directly or indirectly related to employment."  To establish a prima facie case of discrimination

32

under Oh. Rev. Code § 4112.02(A), a plaintiff must show: 1) he was handicapped; 2) an adverse employment action was taken by the employer, at least in part, because the plaintiff was handicapped; and 3) the plaintiff, though handicapped, can safely and substantially perform the essential functions of the job in question. <u>City of Columbus Civil Serv. Comm'n v. McGlone</u>, 697 N.E.2d 204 (Ohio 1998). Under Ohio law, an employer must also make a reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business. <u>Smith v. Dillard Dep't Stores, Inc</u>., 744 N.E.2d 1198, 1202 (Ohio Ct. App. 2000); Ohio Admin. Code § 4112-5-08(E)(1).

In evaluating disability discrimination claims brought under Ohio law, federal ADA standards will apply as the Ohio Supreme Court has urged Ohio courts to look to the ADA for guidance in interpreting Ohio's prohibition on disability discrimination. <u>McGlone</u>, 697 N.E.2d at 206-07; <u>Brenneman v. MedCentral Health Sys.</u>, 366 F.3d 412, 418 (6th Cir. 2004); <u>Plant v. Morton Int'l, Inc</u>., 212 F.3d 929, 938-39 (6th Cir. 2000). Moreover, both the ADA and Ohio law employ identical language in requiring that a plaintiff be able to perform the "essential functions" of the job with or without reasonable accommodations. <u>See</u> 29 C.F.R. § 1630.2(m); <u>McGlone</u>, 697 N.E.2d at 206-07.

In discrimination cases like this one where the plaintiff has no direct evidence of discrimination, "the plaintiff may attempt to establish his or her claim indirectly through the burden shifting method borrowed from <u>McDonnell Douglas</u>," discussed <u>supra</u>. <u>Monette</u>

33

90 F.3d at 1185.  Once a prima facie case is established, the burden shifts to the defendant to establish a legitimate, non-discriminatory reason for its action.  Id.  If the defendant provides a legitimate business reason, the plaintiff must then show, by a preponderance of the evidence, that the employer's reasoning is pretextual.  Id. at 1185-86.

SpectraSite argues that Conners cannot meet his burden of establishing a prima facie case of discrimination under Ohio law or the ADA because: 1) he cannot establish that the requested accommodation, namely an undetermined amount of medical leave, was reasonable, and 2) he cannot establish that he was qualified to perform the essential functions of his position with SpectraSite because he has consistently maintained that he is unable to work. Therefore, he was not a "qualified individual" under the ADA or Ohio anti-discrimination laws.

### A.   Conners's requested accommodation

Conners argues that it is not his burden to demonstrate that his requested accommodation was reasonable, but rather SpectraSite must show that his request for medical leave, including FMLA leave and subsequent disability leave, would constitute an undue burden or hardship under Monette.

Conners's interpretation of Monette is incorrect.  Monette establishes that while "the employer has the burden of persuasion on whether an accommodation would impose an undue hardship," it is a plaintiff's initial burden to propose "an accommodation and show[] that that accommodation is objectively reasonable." Monette, 90 F.3d at 1183 (emphasis in original).  Therefore, the Court must first determine if Conners has met his prima facie case

for disability discrimination, which includes showing that his
proposed accommodation was objectively reasonable.

Conners does not dispute that the accommodation he sought from
SpectraSite was an unknown, undetermined amount of medical leave.
Conners also does not dispute that prior to his termination on July
1, 2004, SpectraSite granted him a several month-long leave of
absence, from early 2003 through the late summer or fall of 2003,
due to his medical condition and attendant course of drug therapy.

While the Sixth Circuit has "recognized that a medical leave
of absence can constitute a reasonable accommodation under
appropriate circumstances," Walsh, 201 F.3d at 726 (citing Cehrs v.
Northeast Ohio Alzheimer's Research Inst., 155 F.3d 775 (6th Cir.
1998)), "when . . . an employer has already provided a substantial
leave, an additional leave period of a significant duration, with
no clear prospects for recovery, is an objectively unreasonable
accommodation."  Id. at 727; see also Hudson v. MCI Telecomm.
Corp., 87 F.3d 1167, 1169 (10th Cir. 1996) (upholding the district
court's grant of summary judgment on wrongful termination claim
where the plaintiff failed to present any evidence of the expected
duration of her treatment or impairment as of the date of her
termination).

Conners argues that SpectraSite "offered its employees FMLA
medical leave and short-term and long term disability insurance
benefits precisely as an accommodation for the kind of serious
medical conditions and debilitating treatments Plaintiff had to
undergo."  (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. 25.)
Presumably, Conners refers to his own previous medical leave and
his peer Nickel's two leaves of absence.  Nickel testified that he

35

took two months of medical leave to recover from the removal of a
tumor in his leg in 2002, and in late 2004 took "FMLA" leave for
the birth of his daughter.  (Nickel Dep. 23, 29.)  Nickel's
circumstances are not similar to Conners's, as Conners admittedly
requested a leave of unknown duration after a period of leave seven
to eight months long.  This evidence fails to create a genuine
issue of material fact as to the objective reasonableness of
Conners's request for an <u>undetermined</u> amount of medical leave after
his previous seven to eight month long medical leave.  Accordingly,
Conners has failed to show his alleged request for leave was
reasonable, and cannot make a prima facie case of discrimination.

**B.  Conners's ability to perform the essential functions of his position with SpectraSite**

SpectraSite also argues that Conners cannot show he was
qualified to perform the essential elements of his position with
SpectraSite, and therefore, cannot prove his prima facie case of
discrimination as he was not a "qualified individual." SpectraSite
bases its arguments on Conners's statements regarding his condition
in his claims for disability and Social Security Administration
benefits after his termination, as well as his deposition testimony
regarding his physical condition.  Conners argues that whether he
was a "qualified individual" should be gauged at the time of the
termination, and that "an application and/or award of social
security disability benefits is not dispositive of whether an
individual is 'qualified' under the ADA," citing <u>Griffith v. Wal-
Mart Stores, Inc</u>., 135 F.3d 376, 380 (6th Cir. 1998).  (Pl.'s Mem.
in Opp. to Def.'s Mot. for Summ. J. 26.)

In his deposition, Conners testified as follows:

36

Q.    Okay.  Now, it's your position, is it not, that you
      have been unable to work since about July 1st of
      2004; is that correct?
Mr. Thompson: I'm going to object to the extent that that
requires any kind of legal analysis, but go ahead.
The Witness: I have not been able to work since then.
By Ms. Ewalt:
Q.    Because of your physical condition.
A.    Correct.

(Conners Dep. 251.)  Conners further testified:

Q.    I just want to clarify this.  You are saying, are
      you not-well, let me back up and make that
      affirmative statement.  It's true, isn't it, that
      you do not believe that you could perform the
      duties of your account executive position since
      July 1st of 2004 because of your medical condition?
Mr. Thompson: Again, I'm going to object to the extent
that it requires any kind of legal analysis.  But you can
answer the question.
The Witness: Well, we can put it on a scale of, not the
performance that I would expect.
By Ms. Ewalt:
Q.    Um-hm.
A.    There is other people who I believe can get by
      doing very little.  And I can't.  I need to make
      sure everything's right, and no, I could not do
      that job.
Q.    Okay.  Is there something that could have been
      provided to you by the company that would have
      allowed you to do the job to the same extent you'd
      been doing it before?
A.    Yes.
Mr. Thompson: Calls for speculation.  Go ahead, you may
answer.
The Witness: Let me go on my FMLA leave, feel a little
bit better, come back.  And we had already talked about
not traveling as much. So yes, there were accommodations
that could have helped.
By Ms. Ewalt:
Q.    Do you know whether your medical condition would
      have permitted you to return within 90 days of the
      July 1st, 2004?
A.    I don't-
Mr. Thompson: Same objection.  You may answer the
question.
The Witness: I don't know that.

> Q.   As far as you know, during the last period of time
>      since you've been away from SpectraSite, your
>      condition has been, I think you said was worse.
> A.   Worsened, yes.

(Conners Dep. 266-68.)

Finally, Conners testified:

> Q.   And your limitations currently, as they stand
>      currently in your medical condition are what: What
>      are you restricted from doing by the doctors?
> A.   I just read the last statement.  I think it was
>      pretty much everything.
> Q.   You can't do anything?
> A.   Pretty much so.  I don't know specifics.  We'd have
>      to read the information.
> Q.   What information-
> A.   Work at any level.
> Q.   You can't do work at any level?
> A.   That's what it had on my last-
> Q.   Okay.  And do you know when those restrictions went
>      into effect?
> A.   I do not.

(Conners Dep. 275-76.)

While an individual's status as disabled for the purpose of obtaining social security disability benefits is not dispositive as to the individual's status as a "qualified employee" under the ADA, here, Conners has testified in his deposition on August 25, 2005, that as of that date, he was still not able to work "at any level," and that he has not been able to work since his termination from SpectraSite on July 1, 2004.  Although Conners thought that SpectraSite could have given him medical leave to allow him time to undergo his therapy and "feel better," he then testified that he did not know if he would have been able to return to his job even after ninety days of leave.  Thus, even if an undetermined amount of medical leave were an objectively reasonable accommodation, Conners has not presented any evidence showing that he would be

able to perform the essential functions of his job at SpectraSite with this accommodation. Without even addressing his statements in his social security disability request and disability benefits applications, his own admissions from his deposition "negate the qualified individual element" of his ADA claim. <u>Townley v. Blue Cross and Blue Shield of Michigan</u>, 254 F. Supp. 2d 661, 666 (E.D. Mich. 2003)(relying in part on the plaintiff's admissions at her deposition that from the date of her termination through the date of her deposition she was unable to work and would not have been able to work even with an accommodation, under <u>Brickers v. Cleveland Bd. of Ed.</u>, 145 F.3d 846, 850 (6th Cir. 1998), to conclude that the plaintiff failed to show she could perform the essential functions of a given position with or without an accommodation); <u>Winters v. Crittenden County Bd. of Ed.</u>, No. 5:04CV-144-R, 2006 U.S. Dist. LEXIS 3533 (W.D. Ky Jan. 24, 2006) (where the plaintiff testified in her deposition that she had not worked and had not looked for work since her termination because she is not able to do any kind of work, she could not make her prima facie case under the ADA).

Accordingly, Conners has failed to show evidence of a prima facie case of discrimination under the ADA and Ohio law because he cannot show that he was otherwise qualified for the position, with or without reasonable accommodation. The Court grants summary judgment in SpectraSite's favor on Conners's ADA and Ohio law disability discrimination claims.

### C. Conner's Ohio Public Policy Disability Discrimination Claim

Conners claims that SpectraSite's disparate treatment of him, refusal to grant him a reasonable accommodation for his disability,

39

and wrongful termination violated Ohio's public policy under Oh. Rev. Code § 4112.02.  Neither party specifically address this claim on SpectraSite's Motion for Summary Judgment.

Simply put, Conners's public policy claim fails because the underlying statutory discrimination claims fail.  As discussed above, Conners cannot succeed on either statutory claim under the ADA or Oh. Rev. Code § 4112.02.  Therefore, any claim based on the policy contained in those statutes also fails.  Weller v. Titanium Metal Corp., 361 F.Supp.2d 712, 724 (S.D. Ohio 2005); see also Knox v. Neaton Auto Prods. Mfg., 375 F.3d 451, 460 (6th Cir. 2004) (where plaintiff's Oh. Rev. Code § 4112 and Title VII discrimination claims failed on summary judgment, and because she failed to identify any other public policy that her employer violated, her wrongful termination in violation of Ohio public policy claim necessarily failed as well).

Further, Ohio courts have dismissed tort actions premised on the public policy contained in Oh. Rev. Code § 4112 because the statute provides adequate remedies.  See Lewis v. Fairview Hosp., 806 N.E.2d 185, 188-89 (Oh. Ct. App. 2004).  The statutory remedies that exist under the ADA and Oh. Rev. Code § 4112 are adequate to protect society's interest in discouraging employers from engaging in discrimination and further provide sufficient compensation to the victims of such discrimination.

Conner's claim for violation of Ohio public policy under Oh. Rev. Code § 4112.02 is dismissed.

**V.    Conners's ERISA Claim**

Conners asserts that SpectraSite knowingly terminated his employment to avoid the vesting of the benefits in its Disability

40

Benefits Plan in violation of ERISA § 510.

**A. Prima Facie Case**

Section 510 of ERISA states, "[i]t shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" 29 U.S.C. § 1140. The Sixth Circuit has held to state a claim under § 510, a plaintiff must show, though either direct or circumstantial evidence, that his employer had a "specific intent" to violate ERISA. <u>Smith</u>, 129 F.3d at 865. Direct evidence is that which "'if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" <u>Schweitzer v. Teamsters Local 100</u>, 413 F.3d 533, 537 (6th Cir. 2005) (quoting <u>Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp</u>., 176 F.3d 921, 926 (6th Cir. 1999)). Direct evidence does not require that the fact finder draw any inferences to determine that the employer's actions were motivated, in part, by discrimination. <u>Id</u>. (citing <u>Johnson v. Kroger Co.</u>, 319 F.3d 858, 865 (6th Cir. 2003)).

If a plaintiff is unable to present direct evidence as to his employer's intent, he must state a prima facie case of discrimination by showing: 1) prohibited employer conduct; 2) taken for the purpose of interfering; 3) with the attainment of any right to which the plaintiff may become entitled. <u>Smith</u>, 129 F.3d at 865. The plaintiff's burden to show the prima facie elements of his case is not meant to be onerous. <u>Smith v. Hinkle Mfg., Inc</u>., 36 Fed. Appx. 825, 829, (6th Cir. 2002) (citing <u>Christian v. Wal-</u>

Mart Stores, 252 F.3d 862, 870 (6th Cir. 2001)).

Conners's discharge unquestionably prevented him from exercising his rights to short-term disability benefits. Accordingly, the question is whether there is evidence from which a fact finder could properly infer that when SpectraSite terminated Conners's employment, it did so with the purpose of interfering with Conners's receipt of short-term disability benefits.

As to the second factor, a plaintiff need not show that the employer's sole purpose in discharging him was to interfere with his entitlement to benefits, but rather that it was a motivating factor in the decision to terminate. Shahid v. Ford Motor Co., 76 F.3d 1404, 1411 (6th Cir. 1996). In other words, a plaintiff submitting a claim under § 510 must demonstrate a "'causal link' between the adverse employment decision and the loss of benefits." Schweitzer, 413 F.3d at 537 (citing Johnson, 319 F.3d at 865). "To survive defendants' motion for summary judgment, plaintiff must come forward with evidence from which a reasonable jury could find that defendants' desire to avoid pension liability was a determining factor in plaintiff's discharge." Humphreys v. Bellaire Corp., 966 F.2d 1037, 1044 (6th Cir. 1992).

The Sixth Circuit has stated, "temporal proximity between termination of employment and an event signaling increased costs to a benefit program can 'support an inference that the adverse actions were taken with the intent of interfering with future . . . benefits.'" Smith, 36 Fed. Appx. at 829 (quoting Smith, 129 F.3d at 865) (employee met her burden of showing the employer's actions were done with the purpose of interfering with her employee

benefits where the evidence showed that she was discharged two weeks after her supervisor found out about her son's severe medical conditions, and it was undisputed that his condition could well lead to the imposition of substantial costs to the employer's insurer); <u>see also</u> <u>Humphreys</u>, 966 F.2d at 1043-44 (where former employee presented evidence that his pension would have vested within two months of his termination and cost his former employer a substantial amount, he minimally satisfied his burden of proving his prima facie case because "the proximity to vesting provides at least some inference of intentional, prohibited activity").

Conners asserts exactly this, that the proximity in time between his alleged request for FMLA leave and short-term disability benefits on or about June 8, 2004, was less than thirty days prior to his termination on July 1, 2004. From the timing of events, Conners argues, an inference can be drawn that a motivating factor in SpectraSite's decision to discharge Conners was its intent to deny him short-term disability benefits.

**B.   Same Actor Inference**

In its Motion, SpectraSite argues that Conners has failed to show that its alleged desire to deny him short-term disability was a motivating factor in its decision to terminate his employment, particularly in light of the fact that it previously granted him an extended leave of absence, during which SpectraSite paid its portion of Conners's group health benefits and after which SpectraSite reinstated Conners to his former position as account executive.

SpectraSite cites to <u>Hartsel v. Keys</u>, 87 F.3d 795, 804 n.9 (6th Cir. 1996), for the proposition that this Court may infer a

43

lack of discriminatory motive where the same person, in this case, Boyer, made a favorable decision regarding the employee with the knowledge of the employee's protected status, and subsequently made an adverse decision regarding the same employee.  The Sixth Circuit has held in adopting this so-called "same-actor inference" that "this general principle applies regardless of whether the class is age, race, sex, or some other protected classification." Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995).  Assuming for the purposes of this Motion only that the same-actor inference applies to denial of employee benefits claims under ERISA, the Court notes that the Sixth Circuit has specifically held that "where the fact finder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." Wexler v. White's Fine Furniture, 317 F.3d 564, 573 (6th Cir. 2003).

Conners has produced minimal evidence from which a reasonable trier of fact could find that SpectraSite's decision to terminate his employment was in part motivated by its desire to prevent Conners from taking short-term disability due to the close proximity in time between Conners alleged announcement of his intent to avail himself of his short-term disability benefits and his termination.  Therefore, the Court will continue to analyze Conners's claim under the McDonnell Douglas burden-shifting paradigm.

### C. Legitimate, Non-Discriminatory Reason for Termination

Once a plaintiff proves his prima facie case, an employer may rebut the presumption of its impermissible action by

44

"'introduc[ing] admissible evidence of a legitimate, non-discriminatory reason'" for its actions. <u>Humphreys</u>, 966 F.2d at 1043 (quoting <u>Gavalik v. Continental Can Co.</u>, 812 F.2d 834, 853 (3d. Cir. 1987).

SpectraSite has introduced evidence of legitimate, non-discriminatory reasons for discharging Conners, namely the inappropriateness of the Saucedo email and Conners's allegedly disruptive behavior during his meeting with Boyer at Frisch's restaurant prior to his termination.

### D. Pretext

If the employer can show a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must then either prove that "interference was a motivating factor" or that the employer's proffered reason "is unworthy of credence." <u>Id</u>. (citing <u>Gavalik</u>, 812 F.2d at 853). Pretext, which must be shown by a preponderance of the evidence, may be shown by demonstrating: 1) that the proffered reasons had no basis in fact; 2) that the proffered reasons did not actually motivate the discharge; or 3) that the proffered reasons were insufficient to motivate discharge, as stated, <u>supra</u>. <u>Walsh</u>, 201 F.3d at 729 (quoting <u>Manzer</u>, 29 F.3d at 1084); <u>Sullivan v. Coca-Cola Bottling Co. of Ohio/Kentucky</u>, No. 05-3364, 2006 U.S. App. LEXIS 12390, at *13 (6th Cir. May 18, 2006).

It should first be noted that the evidence of the temporal proximity of Conners's alleged medical leave of absence request and his termination cannot also serve to show pretext. <u>Skrjanc v. Great Lakes Power Serv. Co.</u>, 272 F.3d 309, 317 (6th Cir. 2001) (finding "temporal proximity is insufficient in and of itself to

establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual"). At this stage, Conners has the burden of coming forth with additional evidence showing that SpectraSite's proffered reasons for terminating Conners's employment were pretextual.

Conners asserts that SpectraSite's proffered reasons for terminating him amount to pretext for three reasons. First, Conners argues that SpectraSite's assertion that it terminated him for the Saucedo email is belied by the evidence in the record. Second, Conners argues that the other proffered reason for his termination, that Boyer felt physically threatened by Conners during the Frisch's meeting, is also not supported by the evidence in the record. Finally, Conners argues that SpectraSite's assertion, that Conners's final written warning and the admonition against him engaging in "unproductive emails" in his final performance review factored into the decision to dismiss him, is untrue.

The Court finds no merit in Conners's first and third arguments relating to the Saucedo Email and the final written warning. However, as explained more fully below, Conners has offered evidence showing that his version of what happened at the Frisch's meeting differs substantially from Boyer's version of events. Assuming for the purposes of this Motion that Conners's version is true, it casts serious doubt on the veracity of one of SpectraSite's proffered reasons for terminating Conners's employment, and indeed the very reason that was described by Parks as "the straw that broke the camel's back." Accordingly, Conners has met his burden of establishing evidence of pretext at the

summary judgment stage, such that SpectraSite's Motion on Conners's ERISA interference claim must be denied.

Conners first argument attempting to show pretext is unavailing. Conners maintains that T-Mobile, and Saucedo, were difficult to deal with, and that Boyer advocated for his account executives to treat T-Mobile with a firm hand. Conners points out that Boyer admitted Conners had a history of excellent customer service. Conners refers to Boyer's testimony that Boyer has never recommended termination of an employee for inappropriate conduct toward customers and did not recommend Conners's termination because of the Saucedo email.

Conners, however, does not deny that he sent the Saucedo email. The Court will not second-guess SpectraSite's legitimate business decisions with respect to its characterization of the Saucedo email, despite Conners's past successes in relating with customers. See Heck v. Bd. of Trustees, Kenyon College, 12 F. Supp. 2d 728, 741 (S.D. Ohio 1998) (noting that an employee's past positive evaluations do not discredit the employer's proffered reasons for termination because it is the employee's performance at the time of termination which is relevant); Hartsel, 87 F.3d at 801 (noting "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with . . . . rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons"). The Sixth Circuit in Hartsel described the so-called business judgment rule this way in a gender and age discrimination context: "'summary judgment is not appropriate every time an employer offers this business judgment rationale.'" Hartsel, 87 F.3d at 800 (quoting

47

Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir.
1988)).  However, the court continued, "'[t]he distinction lies
between a poor business decision and a reason manufactured to avoid
liability . . . . Thus, facts may exist from which a reasonable
jury could conclude that the employer's business decision was so
lacking in merit as to call into question its genuineness.'" Id.
(quoting Dister, 859 F.2d at 1116).

Additionally, though Conners argues that Boyer did not
recommend termination because of the Saucedo email, he also
testified that prior to the meeting at Frisch's both he and Parks,
were leaning toward termination.  Finally, Conners asserts that no
other account executives were terminated for inappropriate conduct
towards customers, and puts forth evidence that Nickel and another
account executive, Randy Brown, received warnings from Boyer
regarding such conduct,[5] however, Conners has not shown how these
incidents were substantially identical to the Saucedo email in any
way.  See Peters v. Lincoln Elec. Co., 285 F.3d 456, 471-72 (6th
Cir. 2002)(citing Manzer, 29 F.3d at 1084).  As such, these alleged
incidents fail to show pretext on SpectraSite's part.

Conners argument that his final written warning could not have
actually been taken into account in SpectraSite's decision to
terminate him is similarly not well-taken.  Conners cites to
Boyer's testimony that he did not know the details of the

_____

[5]
    Specifically, Conners points to Boyer's deposition testimony where he
stated that he disciplined Brown for not showing up at a meeting with a customer.
(Boyer Dep. 75-76.)  Boyer also testified that he gave Nickel four to five verbal
warnings and some written warnings for "acting inappropriately with a customer."
(Id. at 71-72.)  However, Conners does not point to any testimony or evidence
which shows what Nickel did in allegedly acting inappropriately toward customers.

allegations contained in Conners's final written warning, and that the negative comments in Conners's 2004 Performance Review were "not a big deal" to support this argument. However, even assuming those facts to be true, Conners ignores the fact that Boyer was not the sole decision-maker in his termination. Rather, Parks, Agresta, and Asbury were also involved in the decision, and Parks and Asbury reviewed Conners's employee file which contained the final written warning prior to his termination.

Conners also argues that Boyer's purported reason for terminating Conners, Conners's behavior at their meeting at Frisch's, was belied by the record. Although not the only proffered reason for his termination from SpectraSite, Conners's alleged disruptive behavior at the meeting was the "straw that broke the camel's back," according to both Parks and Boyer.

Boyer testified that Conners "raised his temper, he's yelling and I was afraid of him," and that he thought Conners was going to physically assault him. (Boyer Dep. 60-61.) Conners testified that he did not know or remember all that happened at the meeting, but did recall that "Todd went right into the email and issues and things that he perceived were problems." (Conners Dep. 209.) Conners testified that he did not believe that he raised his voice during the meeting, that he went back to Frisch's "and asked them, and they said that there was no display of anything that they noticed." (Id. at 212.) After the meeting Boyer told Parks that he did not want Conners on his team and recommended termination. Parks, Boyer, and Agresta made the decision to terminate Conners's employment collectively, with Asbury's concurrence.

If Boyer, an integral part of the decision-making team, was

49

not telling Parks and Agresta the truth about Conners's conduct during the meeting, a reasonable trier of fact could find that SpectraSite's proffered reason as to what sealed Conners's fate with regards to its decision to terminate his employment was false. From this, the trier of fact could reasonably infer that the proffered reason was pretextual, especially in light of the discrepancies as to weather or not Boyer received Conners's request for medical leave in early June.

During oral argument SpectraSite argued two points that are worth discussing here. First, SpectraSite noted that part of Conners's conduct at the meeting included making comments to the effect that he did not want to work with T-Mobile any longer and would "call a spade a spade." SpectraSite argues that because Conners testified that he did not recall whether or not he made these comments, his testimony is not enough to overcome Boyer's version of the events. This argument does not encompass all of Boyer's testimony, however, in which he clearly stated that Conners raised his voice and his temper, flew off the handle, and made Boyer feel afraid for his safety. Conners does dispute this portion of Boyer's testimony. Further, Boyer's testimony as to why he recommended termination after the meeting encompasses both of these allegations, but particularly focuses on Conners's attitude toward him, not toward T-Mobile.

Second, SpectraSite urges the Court to follow the Sixth Circuit's reasoning in its opinion affirming the district court's grant of summary judgment on a plaintiff's FMLA interference and retaliation claims in McConnell v. Swifty Trans., Inc., No. 05-4297, 2006 U.S. App. LEXIS 21900 (6th Cir. Aug. 23, 2006). In

McConnell, the plaintiff was diagnosed with acute stress reaction and major depression. Id. at *2. Swifty's disability benefits provider, Jefferson Pilot Life Insurance, informed McConnell that his request for short-term disability benefits was approved through June 26, 2003, but was denied after that time. Id. at *3. A representative of Jefferson Pilot called McConnell to inform him of its decision regarding his benefits. Id. According to the representative, McConnell became mean, upset, and ultimately allegedly told her he would personally pay her a visit with his gas tanker truck. Id. McConnell denied making this statement. Id. at *4. The Jefferson Pilot representative reported the perceived threat to her supervisor and one of Swifty's employees, Bridget Smith. Id. Bridget Smith then contacted Swifty's president, Don Smith, who informed the Jefferson Pilot employee not to worry because McConnell would no longer be working for Swifty. Id. The next day Mr. Smith advised Swifty's "Traffic Manager," and one of McConnell's managers, of McConnell's alleged threat and told him to investigate the allegation. Id. at **4-5. The manager called McConnell, and though the two disputed whether McConnell admitted to making the threat, the manager terminated McConnell's employment during the phone call. Id. at *5. The court held that even assuming McConnell did not make the threat, McConnell had not produced sufficient evidence to prove that Swifty's belief that he did make the threat was not honestly held. Id. at *15. The court noted that it "must not substitute [its] judgment for the reasoned judgment of the a business decisionmaker." Id.

The Court has recognized the application of the business judgment rule in examining SpectraSite's reliance on the Saucedo

Email.  The scenario with the meeting at Frisch's, however, is distinguishable from the situation presented in <u>McConnell</u>.  Here, Boyer, who's testimony is called into question by Conners's own testimony, was a decision maker with respect to SpectraSite's termination of Conners.  Boyer did not hesitate to recommend termination to Parks and Agresta after the Frisch's meeting because of Conners's alleged conduct toward him.  The informant in <u>McConnell</u>, on the other hand, was not even a Swifty employee, much less a Swifty employee with decision-making power who ultimately weighed-in and voted to terminate McConnell's employment.  While the application of the business judgment rule espoused in <u>McConnell</u> would apply to SpectraSite's interpretation of the Saucedo Email, and even SpectraSite's analysis of the final written warning in Conners's personnel file, it does not follow that the rule applies when one of the decision makers may have falsely represented the employee's conduct, directly resulting in the employee's termination on the basis of that conduct.

Conners has thus provided evidence showing a genuine issue of material fact which is in dispute as to SpectraSite's reasons for terminating his employment.  He has met his burden of showing that a reasonable trier of fact could find that the tipping point in the decision to terminate him, his alleged behavior at Frisch's, is unworthy of credence.  SpectraSite's Motion for Summary Judgment on Conner's ERISA interference claim is denied.

## VI.  Conners's Public Policy Denial of Employee Benefits Claim

In his Second Amended Complaint, Conners states that SpectraSite violated Ohio's established public policies regarding discriminating against an employee by denying him employee

52

benefits.  As SpectraSite points out in its Reply Brief in Support of its Motion for Summary Judgment, Conners does not make any arguments with respect to this claim in his Memorandum in Opposition to SpectraSite's Motion for Summary Judgment. SpectraSite also argues that this claim is preempted by ERISA.

Conners has not made any arguments regarding this claim in his Memorandum in Opposition, nor has he pointed the Court toward any law under which such a claim even exists.  The Court finds that Conners has abandoned this claim and accordingly grants SpectraSite's Motion as to this claim.

**VII. <u>Conclusion</u>**

This Court DENIES Spectrasite's Motion for Summary Judgment on Conners's ERISA interference claim and GRANTS SpectraSite's Motion for Summary Judgment on Conners's remaining claims.

It is so ORDERED.

<div style="margin-left: 40%;">
s/ James L. Graham
JAMES L. GRAHAM
United States District Judge
</div>

Date: October 12, 2006